**Q.E.D., INC. Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 01–398 T.**

United States Court of Federal Claims.

Jan. 7, 2003.

Stephen Dunn, Troy, MI, for plaintiff.

George Squires, Department of Justice, Washington, DC, for defendant.

*OPINION*

HEWITT, Judge.

This is an action by a corporate taxpayer to recover penalties imposed by the Internal Revenue Service (IRS) under 26 U.S.C. §§ 6651 and 6656 for eleven of the twelve quarters from July 1997 through June 2000.[1]

---

**1.** Unless otherwise noted, all section references are to the Internal Revenue Code (I.R.C.) of 1986 (Title 26, United States Code).

Section 6651(a)(1) and (2) authorizes imposition of a penalty for failure to pay when due the amount of tax reported on a tax return, and for failure to pay when due the amount of tax re-

quired to be shown on a tax return, respectively, unless it is shown that such failure is due to reasonable cause and not due to willful neglect.

Section 6656(a) authorizes imposition of a penalty for failure to deposit in a government depository on the date prescribed any amount of employment taxes imposed by the Code, unless it is

By counterclaim, the IRS seeks penalties for unpaid employment taxes that were assessed against, noticed upon, and demanded of plaintiff for the third quarter of 1999, the first quarter of 2000, and the second quarter of 2000. Trial was held in Detroit, Michigan, at which the court heard the testimony of six witnesses and received 70 exhibits.

## I. Background

Plaintiff Q.E.D. Inc. (Q.E.D.) is a Michigan corporation providing engineering and design services to the automobile manufacturing industry. First Amended Complaint (Am. Compl.) ¶ 2; Defendant's Post–Trial Brief (Def.'s Post–Trial Br.) at 4. Q.E.D. was formed in January 1994 by Thomas David Armstrong, a British national residing in Michigan. Plaintiff's Post–Trial Brief (Pl.'s Post–Trial Br.) at 7; Def.'s Post–Trial Br. at 4;[2] Joint Trial Exhibit (Jt.Ex.) 20. Mr. Armstrong has served as president of the company since its formation in 1994.[3] Transcript of Trial (Tr.) at 214–15.

Approximately six months after the formation of the corporation, Q.E.D. acquired its first customer. See Tr. 219, 340. To finance the operation of Q.E.D., Mr. Armstrong sold 51% of Q.E.D.'s stock to Hammond Machinery, Ltd. (Hammond Machinery) in October 1994 for approximately $140,000.[4] See Deposition of Royston G. Hammond (Hammond Dep.) at 49–51;[5] Defendant's Trial Exhibit (Def.'s Ex.) 15 at 8–9; Def.'s Ex. 19. Hammond Machinery is a British company engaged in the business of selling machine tools for the automotive industry. Hammond Dep. at 30.

To obtain additional financing of Q.E.D.'s operations when it was unable to secure a less expensive line of credit, Q.E.D. entered into a factoring agreement in 1994 with Triad Financial Corporation (Triad).[6] Am. Compl. ¶ 9; Def.'s Post–Trial Br. at 6; Pl.'s Post–Trial Br. at 8. Under the factoring agreement, Triad advanced Q.E.D. 75% of the amount of each invoice and charged plaintiff interest at annual rates of up to 36%.[7] Am. Compl. ¶ 9.

To deposit and pay its employment taxes, Q.E.D. maintained a contract with Paychex, a payroll processing service for small businesses that included a tax paying service, from plaintiff's formation in 1994, until October 1995. Tr. at 563–66; Def.'s Ex. 23 at 10183, 10185. Plaintiff terminated the tax paying portion of the payroll service in October 1995.[8] See Def.'s Ex. 23 at 10184. There-

shown that such failure is due to reasonable cause and not due to willful neglect.

2. The parties' post-trial briefs contain detailed references to the trial transcript and the exhibits for the points cited.

3. Mr. Armstrong's spouse, Helen Armstrong, served as the company's president for less than a year after the company was formed. Trial Transcript (Tr.) at 214–15.

4. Following the stock sale to Hammond Machinery, the ownership of Q.E.D. was as follows: 5100 shares (51% of all shares) to Hammond Machinery; 2000 shares (20% of all shares) to Mr. Armstrong; 1500 shares (15% of all shares) to David James Alexander, an employee of Q.E.D.; and 1400 shares (14% of all shares) to Helen Watson, an employee of Q.E.D. and then-fiancee of Mr. Armstrong. Def.'s Ex. 15 at 8–9; Def.'s Ex. 19.

5. Portions of Mr. Hammond's deposition were received into evidence at trial. See Tr. at 1507–14.

6. Triad later became Crestmark Financial Corporation (Crestmark). See Amended Complaint (Am.Compl.) ¶ 9. Matters cited to the Amended Complaint were not disputed at trial. For convenience, the court refers to both Triad and Crestmark as Triad.

7. Under the factoring arrangement, payments from Q.E.D.'s customers were mailed to Triad and deposited into Triad's bank account. Am. Compl. ¶ 9. From the payments, Triad deducted the amount it had advanced to Q.E.D. plus interest at annual rates of up to 36%. Id. Triad then remitted the balance, if any, to Q.E.D. Id. After May 1998, the advanced amount to Q.E.D. was increased to 85% of each invoice and the interest rate charged was decreased to 24%. Id.

8. At trial, Mr. Armstrong stated that the tax paying service offered by Paychex required payment from Q.E.D. on the eve of payroll and almost one week before the tax deposits were due. Tr. at 566–67. After explaining how the early payment to Paychex adversely affected Q.E.D.'s cash flow, see id. at 224–26, Mr. Armstrong stated that he had terminated the tax paying portion of the payroll processing service on behalf of Q.E.D. to gain a few additional days to receive incoming invoice payments before plaintiff paid its employment taxes. See id. at 224–26; 566–67.

after, and through mid–2000, plaintiff repeatedly failed to deposit employment taxes when due. Defendant's Post–Trial Brief (Def.'s Post–Trial Br.) at 6–7.

For eleven of the twelve quarters from July 1997 through June 2000, the IRS assessed penalties against Q.E.D. for unpaid employment taxes (including both its non-trust fund employment taxes and its trust fund employment taxes).[9] Def.'s Post–Trial Br. at 2. For the first quarter of 1998, the IRS assessed against Q.E.D. amounts representing deficiencies in employment taxes paid, plus interest, and §§ 6651 and 6656 penalties. *Id.* For the other ten quarters, the IRS assessed against Q.E.D. penalties prescribed by §§ 6651 and 6656 for failures, respectively, to pay or to deposit taxes within the required time period. *Id.* at 2–3.

In July 2001, plaintiff filed suit seeking a refund of the paid penalties under I.R.C. §§ 6651 and 6656.[10] Complaint (Compl.) at ¶¶ 1, 14, 16. Plaintiff alleges that its failure to file its employment tax (Form 941 tax) returns and its failure to timely pay its Form 941 taxes was due to reasonable cause rather than willful neglect. *See id.* at ¶ 5. On that ground, plaintiff claims that it is entitled to an abatement of the penalties it paid. Compl., Ex. A (Supplementary Statement to Forms 843) at 2.

Defendant has counterclaimed seeking payment of unpaid penalties for first quarter 1998, third quarter 1999, first quarter 2000, and second quarter 2000. Second Amended Answer and Second Counterclaim (Sec.Am. Ans.) ¶¶ 24, 27–29.

## II. Discussion

### A. Burdens of Proof

 In a tax refund action, the taxpayer has the burden of proving by a preponderance of the evidence that the assessment is incorrect and what the correct amount of tax, if any, is. *Helvering v. Taylor,* 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623 (1935); *Cook v. United States,* 46 Fed.Cl. 110, 116 (2000). With respect to defendant's counterclaim, the IRS generally satisfies its burden to establish a prima facie case by offering into evidence a certified copy of the tax assessment. *Cook,* 46 Fed.Cl. at 119. The burden of proof then shifts to the taxpayer to show that it is not liable for the assessed tax and/or penalties plus interest. *Id.; Bolding v. United States,* 215 Ct.Cl. 148, 565 F.2d 663, 672 (1977).

### B. The Applicable Law

 Sections 6651(a)[11] and of incomes of individuals, *see* I.R.C. § 1, that employers are required to collect and withhold from their employees' wages, and to pay over to the United States. *See* I.R.C. § 3402.

Employment taxes also include "non-trust fund" employment taxes which are imposed directly on employers. "Non-trust fund" employment taxes include taxes that are based on amounts of wages imposed on employers by the Federal Insurance Contributions Act, *see* I.R.C. § 3111, and by the Federal Unemployment Tax Act. *See* I.R.C. § 3301; *see also* Treas. Reg. § 31.6302–1(e) (definition of employment taxes).

9. In this case, the term "employment taxes" means the taxes imposed by Subtitle C of I.R.C. (§§ 3101–3510). These taxes include "trust fund" employment taxes as set forth in I.R.C. § 7501. Section 7501 of the I.R.C. states:

Whenever any person is required to collect or withhold any *internal revenue tax* from any other person and to pay over such tax to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States. The amount of such fund shall be assessed, collected, and paid in the same manner and subject to the same provisions and limitations (including penalties) as are applicable with respect to the taxes from which such fund arose.

26 U.S.C. § 7501(a). "Trust fund" employment taxes are the taxes imposed on the wages of employees for old-age (social security), survivors, and disability insurance, *see* I.R.C. § 3101(a), and for hospital insurance. *See* I.R.C. § 3101(b). Employers are required to collect these taxes from employees through withholding and to pay the taxes over to the United States. *See* I.R.C. § 3102(b). "Trust fund" employment taxes also include those taxes imposed on the wage portion

10. Plaintiff filed its First Amended Complaint (Am.Compl.) in April 2002. The First Amended Complaint added the taxpayer's claims to abate the penalties it paid for the quarters ending September 30, 1999, March 31, 2000, and June 30, 2000, respectively, following denial by the IRS of its administrative claims seeking a refund of those penalties. Am. Compl. ¶¶ 3, 18–21.

11. Title 26, United States Code, Section 6651(a) states:

In case of failure—

6656 [12] of the Internal Revenue Code authorize the IRS to impose penalties for failure to pay or deposit employment taxes when due unless the taxpayer proves by preponderance of the evidence that such failure is due to reasonable cause and not due to willful neglect.[13] I.R.C. §§ 6651(a), 6656(a). To avoid a penalty for failure to file a tax return or pay tax, the taxpayer must make an affirmative showing of all facts alleged as a reasonable cause for his failure to file such return or pay such tax on time in the form of a written statement, sworn under penalties of perjury, filed with the service center with which the taxpayer's tax return is required to be filed. 26 C.F.R. § 301.6551-1(c)(1).

Treasury Regulation § 301.6551-1(c)(1) provides:

> If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause. A failure to pay will be considered to be due to reasonable cause to the extent that the taxpayer has made a

> > (1) to file any return required under authority of [the pertinent IRC chapter] ... on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate ....
> > 26 U.S.C.A. § 6651(a)(1).

**12.** Title 26, United States Code, Section 6656 provides, in pertinent part:

> (a) Underpayment of deposits.—In the case of any failure by any person to deposit (as required by this title or by regulations of the Secretary under this title) on the date prescribed therefor any amount of tax imposed by this title in such government depository as is authorized under section 6302(c) to receive such deposit, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be imposed upon such person a penalty equal to the applicable percentage of the amount of the underpayment.
> 26 U.S.C. § 6656(a).

**13.** The federal tax deposit rules for withheld income taxes and for Federal Insurance Contributions Act (FICA) taxes attributable to payments

satisfactory showing that he exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship ... if he paid on the due date. In determining whether the taxpayer was unable to pay the tax in spite of the exercise of ordinary business care and prudence in providing for payment of his tax liability, consideration will be given to all the facts and circumstances of the taxpayer's financial situation, including the amount and nature of the taxpayer's expenditures in light of the income (or other amounts) he could, at the time of such expenditures, reasonably expect to receive prior to the date prescribed for the payment of the tax.

26 C.F.R. § 301.6651-1(c)(1). As contemplated by Treas. Reg. § 301.6651-1(c)(1), "a taxpayer [for example] who incurs lavish or extravagant living expenses in an amount such that the remainder of his assets and anticipated income will be insufficient to pay his tax, has not exercised ordinary business

made after December 31, 1992 are set forth in Treasury Regulation (Treas.Reg.) § 31.6302-1. That regulation requires that employers whose payrolls are on Fridays and who report employment taxes in the aggregate for the year in excess of $50,000 are required to deposit their employment taxes in an authorized financial institution on or before the following Wednesday. Treas. Reg. § 31.6302-1(b)(3); § 31.6302-1(b)(4); § 31.6302-1(c)(2). Based on the evidence presented at trial, Q.E.D. is such an employer.

Plaintiff's Form 941 returns report amounts of quarterly employment taxes that significantly exceed $50,000 per year. *See* Jt. Ex. 8 (reported employment taxes of $253,105 for the 3rd quarter 1997); Jt. Ex. 9 (reported employment taxes of $248,031 for the 4th quarter 1997); Jt. Ex. 10 (reported employment taxes of $453,399 for the 1st quarter 1998); Jt. Ex. 11 (reported employment taxes of $351,825 for the 2nd quarter 1998); Jt. Ex. 12 (reported employment taxes of $307,403 for the 3rd quarter 1998); Jt. Ex. 13 (reported employment taxes of $499,001 for the 1st quarter 1999); Jt. Ex. 14 (reported employment taxes of $730,541 for the 2nd quarter 1999); Jt. Ex. 15 (reported employment taxes of $440,570 for the 3rd quarter 1999); Jt. Ex. 16 (reported employment taxes of $473,554 for the 4th quarter 1999); Jt. Ex. 17 (reported employment taxes of $701,578 for the 1st quarter 2000); and Jt. Ex. 18 (reported employment taxes of $465,770 for the 2nd quarter 2000). Moreover, Mr. Armstrong testified at trial that "payroll [for Q.E.D.] was Friday." Tr. at 566.

care and prudence in providing for the payment of his tax liability." 26 C.F.R. § 301.6651–1(c)(1).

In *United States v. Boyle,* 469 U.S. 241, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985), the Supreme Court construed the terms "reasonable cause" and "willful neglect" in § 6651(a) and the phrase "ordinary business care and prudence" in Treas. Reg. § 301.6651–1(c)(1).[14] Mr. Boyle, as executor of his mother's estate, relied on his experienced probate attorney to tell him when the federal estate tax return was due. *Boyle,* 469 U.S. at 242–43, 105 S.Ct. 687. The lawyer failed to timely notify Mr. Boyle of the date for filing the return, and Mr. Boyle filed the return late. *Id.* at 243, 105 S.Ct. 687. After paying the assessed penalty for the late filing plus interest, Mr. Boyle filed suit for a refund of those amounts. *Id.* at 243–44, 105 S.Ct. 687. The determinative legal issue was whether a taxpayer's reliance on an attorney constitutes "reasonable cause" under § 6651(a) for failure to file a return when due, which would relieve the taxpayer of the incurred penalty for filing the return late. *Id.* at 246–47, 105 S.Ct. 687. The Supreme Court wrote that, as used in § 6651(a), "willful neglect" means "a conscious, intentional failure or reckless indifference." 469 U.S. at 245, 105 S.Ct. 687. The Supreme Court approved the interpretation of the term "reasonable cause" to mean "ordinary business care and prudence," as set forth in Treas. Reg. § 301.6651–1(c)(1), and construed the term "reasonable cause" to require the "absence of . . . carelessness" on the part of the taxpayer. 469 U.S. at 246 nn. 3 & 4, 105 S.Ct. 308. The Supreme Court observed that a penalty assessment could only be avoided if the taxpayer showed, not merely an absence of willfulness and recklessness, but also an absence of fault:

> A taxpayer seeking a refund must therefore prove that his failure to file on time was the result neither of carelessness, reckless indifference, nor intentional failure. Thus, the Service's correlation of "reasonable cause" with "ordinary business

care and prudence" is consistent with Congress' intent, and over 40 years of case law as well. That interpretation merits deference.

*Id.* at 246 n. 4, 105 S.Ct. 308.

Among the circuit courts that have examined the issue of whether a taxpayer's failure to file and failure to pay its taxes was due to reasonable cause, there is a split of authority. The Sixth Circuit, in which the taxpayer before the court is located, views the issue as a bright-line matter of law. In *Brewery, Inc. v. United States,* 33 F.3d 589 (6th Cir.1994), the Sixth Circuit held that "since trust fund taxes [which include taxes imposed on employees' wages for social security, survivors and disability insurance] are for the exclusive use of the government, the use of trust funds for the payment of other creditors cannot, as a matter of law, constitute reasonable cause for abating the penalties assessed under 26 U.S.C. §§ 6656 and 6651." 33 F.3d at 592. With respect to non-trust fund taxes [which include taxes imposed on employers by the Federal Insurance Contribution Act and the Federal Unemployment Tax Act], the Sixth Circuit reasoned that "[such] portion of the unpaid tax liability should . . . be dealt with in the same manner as the trust funds since it is an obligation of the employer on behalf of the employee." *Id.* at 593.

The Second Circuit, however, views the issue of reasonable cause as requiring a factual determination. *See Fran Corp. v. United States,* 164 F.3d 814 (2d Cir.1999). In *Fran Corp.,* an employer sought refunds of penalties assessed for late payment and deposit of employment taxes under §§ 6651(a)(2) and 6656(a), respectively, on the ground that its failure timely to pay or deposit was due to reasonable cause and not due to willful neglect. 164 F.3d at 815. The taxpayer experienced severe financial difficulties as a result of problems with two of its large construction contracts. *Id.* The Second Circuit stated:

---

14. The Supreme Court noted that the meaning of the terms "reasonable cause" and "willful neglect" had become clear in the years since the inclusion of the terms in a penalty provision of the Revenue Act of 1916 for failure to file a

return when due. *United States v. Boyle,* 469 U.S. 241, 245 n. 3, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985) (citing Revenue Act of 1916, ch. 463, § 16, 39 Stat. 756, 775).

While courts must consider the obligations to pay Section 7501 trust fund taxes in their analysis of reasonable cause, their analysis may not stop there. We recognize that it will be the rare case where the government is made the "unwilling partner in a floundering business." *Brewery*, 33 F.3d at 593 (internal quotation omitted), without the employer incurring the duty to pay a penalty for having made such a choice, but it nonetheless remains for the court in each case to weigh all of the factors identified in the Regulations.

164 F.3d at 819. The Second Circuit rejected the government's contention of law that an employer's financial difficulties can never constitute "reasonable cause" to excuse these penalties for nonpayment of withholding (trust fund) taxes as inconsistent with Treas. Reg. § 301.6651–1 but found, as a factual matter, that "Fran failed to exercise ordinary business care and prudence and thus has not shown reasonable cause ...." 164 F.3d at 819. In reaching its conclusion, the Second Circuit considered the following expenditures: (1) the taxpayer's monthly payments to its president for rental of office space when the taxpayer owed employment taxes to the I.R.S; and (2) the taxpayer's decision to fund numerous automobile leases and repairs before paying employment taxes owed to the I.R.S. *Id.* at 819–20. The Second Circuit also considered the taxpayer's "imprudence in setting [its] financial priorities" as evidenced by the taxpayer's decision to

pay for golf and hockey outings and for two dinner dances, expenditures intended to develop business. *Id.* at 820. Moreover, the Second Circuit considered the taxpayer's failure to introduce evidence "that it placed its obligations to the IRS before those to any and all creditors not directly related to the two projects that defaulted." *Id.* at 820.

Determining whether a taxpayer's failure to file, to pay or to deposit employment taxes timely is due to reasonable cause and not due to willful neglect is an issue of first impression in this court.

Notwithstanding the split in the decisions of the circuit courts, the weight of the authority favors a factual inquiry into the circumstances of the particular case. *See* Treas. Reg. § 301.6651–1(c)(1) (specifically directing courts to examine "all facts and circumstances of the taxpayer's financial situation"); *Boyle*, 469 U.S. at 246 n. 4, 105 S.Ct. 687 ("[T]axpayer must ... prove that [its] failure to file on time was the result neither of carelessness, reckless indifference, nor intentional failure."); *Fran Corp.*, 164 F.3d at 819 ("[A] court [must] in each case ... weigh all of the factors identified in the Regulations."); *East Wind Indus., Inc. v. United States*, 196 F.3d 499, 508 (3d Cir.1999) (finding that the *Fran Corp.* decision "is the better reasoned approach since it gives meaning to sections 6651 and 6656 of the [Tax] Code and the regulations interpreting them.").[15] This court is similarly persuaded

---

**15.** The facts in *East Wind Indus., Inc. v. United States*, 196 F.3d 499 (3d Cir.1999), are extraordinarily compelling for the taxpayer. The taxpayer manufactured military clothing and goods for sale to the United States Department of Defense, specifically the Defense Logistics Agency (Defense Agencies). 196 F.3d at 501. The taxpayer had a fifteen-year history of obtaining and completing government contracts. *Id.* After ten years of performance under its government contracts, certain employees at the Defense Agencies began soliciting illegal bribes from the taxpayer. *Id.* When the taxpayer declined to pay the bribes, the taxpayer was not awarded new contracts and was not paid amounts due and owing for successfully completed work. *Id.* at 501–02.

The vice president of the taxpayer-corporation sought professional advice concerning the financial and legal issues arising out of the bribery demands and cash flow problems. *Id.* at 502. In turn, the vice president of the taxpayer-corpo-

ration sought several personal loans, including a mortgage on his personal residence, to pay essential personnel, to pay creditors threatening to terminate their services, and to pay a portion of the payroll taxes. *Id.*

Noting the benefits of a taxpayer's election to keep its business operating at a minimum level to collect contractually due payments, *id.* at 509, the court found that the taxpayer's decision to pay its creditors "whose services were essential to maintaining and reworking the inventory" rather than to pay its trust fund taxes did not amount to willful neglect. *Id.* Further, the court found that the taxpayer exercised ordinary business care and prudence as evidenced by: (1) the absence of lavish or extravagant living expenses, and (2) the preservation of $750,000 worth of inventory at the time of the taxpayer's bankruptcy filing. *Id.* at 510–11. The court also found that the taxpayer would have suffered undue financial hardship if the employment taxes had been paid when due. *Id.* at 513. Accordingly,

that a proper legal analysis requires an examination of the factual circumstances of this case.

### C. Q.E.D.'s Failure to Pay Its Taxes

#### 1. Introduction

Plaintiff claims that it attempted to pay all of the employment taxes in question. Am. Compl. ¶¶ 7, 8, 15; Plaintiff's Memorandum of Contentions of Fact and Law (Pl.'s Mem.) at 4. Plaintiff explains that it failed to timely pay its taxes because applying all of its available cash against its tax liability would have required Q.E.D. to "cease operations, lay off all of its employees, and breach its contracts with customers" and thus would have caused an "undue hardship." Pl.'s Post–Trial Br. at 5, 7, 12.

Defendant argues that plaintiff's failure to timely pay its trust fund and non-trust fund employment taxes was not due to reasonable cause as contemplated under §§ 6651 and 6656. Def.'s Post–Trial Br. at 13. Defendant contends that during the time that the taxpayer failed to timely deposit and/or pay the required withholdings from its employees' wages, Q.E.D. transferred the amounts that it had withheld from wages earned by its employees to various creditors, other than the United States, including its employees and primary suppliers. *Id.* at 7, 11, 13. Defendant specifically asserts that, at the time plaintiff was not timely depositing or paying its owed employment taxes, Q.E.D. failed to exercise ordinary business care and prudence: (1) by increasing compensation to the company's president, Mr. Armstrong, and his wife, Helen, *id.* at 13; (2) by paying European educational expenses for Mr. Armstrong's son, *id.* at 7, (3) by paying life insurance premiums for Mr. Armstrong on a policy that designated Mr. Armstrong's wife rather than the company as the beneficiary, *id.* at 7; (4) by expending amounts for sports tickets, holiday parties and entertainment, and for cars used by key company personnel,

including maintenance, insurance and lease payments, *id.* at 8; and (5) by paying invoices submitted by Mr. Hammond, the controlling stockholder of Q.E.D.'s majority shareholder, for supplying engineers to Q.E.D. *Id.* at 11.

#### 2. Q.E.D.'s Cash Flow Problem

■ Mr. Armstrong testified at trial that he provided the initial financing for the operation of Q.E.D. Tr. at 219. Q.E.D. paid its employees and invoiced its customers every 28 days. Pl.'s Post–Trial Br. at 8. Q.E.D.'s customers paid the invoices, on the average, about 50 days after receipt, Tr. at 208, 218, and the payment practice on the larger invoices to two of Q.E.D.'s customers was substantially slower, ranging from 80 to 130 days to pay invoices between 1998 and 2000. *See* Plaintiff's Trial Exhibit (Pl.'s Ex.) 4; Pl.'s Post–Trial Br. at 9–10.

As Q.E.D.'s net sales grew, its accounts receivable grew. *See* Pl.'s Post–Trial Br. at 8–9; Pl.'s Ex. 4, 9; Tr. at 230–36. At the same time, Q.E.D.'s payroll, taxes, and medical costs (plaintiff's three largest expenditures) were also increasing. *See* Tr. at 217, 236–37. The combination of the lag in the payment of invoices by Q.E.D.'s customers and the increase in Q.E.D.'s payroll-related expenses created a difficult cash flow problem. *See* Tr. at 235–36.

To ease the cash flow problem, Mr. Armstrong testified, Q.E.D. received "some input" from Hammond Machinery, a British business. Tr. at 219. In fact, six months after Q.E.D.'s formation, Mr. Armstrong sold a majority of Q.E.D.'s stock to Hammond Machinery for approximately $140,000. Hammond Dep. 49–51; Def.'s Ex. 15 at 8–9, Def.'s Ex. 19. The owner of Hammond Machinery, Royston G. Hammond, testified by deposition that investing in Q.E.D. was an attractive opportunity to provide British engineers with work in the United States.[16] *See* Hammond Dep. at 49–50. Mr. Ham-

---

the court held that the taxpayer was entitled to an abatement of the penalties assessed by the IRS. *Id.*

**16.** Mr. Hammond explained that, at the time that Hammond Machinery purchased 51% of Q.E.D.'s stock, the domestic supply of engineers in the

United States did not meet the demand. Hammond Dep. at 49. He stated that, in 1994, the United States rules for visas afforded Hammond Machinery access to visas that permitted its employees to travel easily between the United Kingdom and the United States. Hammond Dep. at 49–50.

mond and Mr. Armstrong are personal friends. *See* Tr. at 255. The two men met while they were students at Loughborough University of Technology. Hammond Dep. at 25, 48; Def.'s Ex. 15 at 3.

Additionally, Q.E.D. engaged the services of an accounts receivable factor, Triad, to finance the company's operations. Pl.'s Post–Trial Br. at 8. Mr. Armstrong testified that Q.E.D. was unable to obtain financing through its bank because neither he nor Q.E.D. had any assets. *Id.;* Tr. at 220. The annual interest cost of borrowing money under the factoring agreement varied from 27% to 270%. Tr. at 211–12; Pl.'s Ex. 11.

Defendant argued that Mr. Armstrong's failure to consider the cost of capital in his business plan for Q.E.D. significantly contributed to plaintiff's cash flow problem. Def.'s Post–Trial Br. at 6. Plaintiff conceded that the interest charges of Triad contributed to Q.E.D.'s cash shortage but insisted that the dramatic growth of the company's accounts receivable was a "much more significant factor." Pl.'s Post–Trial Br. at 8; Tr. at 233–39; Pl.'s Ex. 4, 9. The focus of plaintiff's argument, however, is misplaced. Q.E.D.'s growing accounts receivable and Triad's high interest charges were not independently contributing factors to Q.E.D.'s cash flow problem but were two aspects of the same problem with plaintiff's business plan. The growing accounts receivable necessitated a larger advance from Triad at an interest rate of more than 25%. *See* Tr. at 211–12.

Mr. Armstrong, an automotive engineer by training, *see* Def.'s Ex. 15 at 3, testified that he had developed a business plan for Q.E.D. prior to forming the company. Tr. at 333. The business plan consisted of a spreadsheet and a graphic depiction of the cost of employing a single individual on a time line projecting cash receipts that permitted Mr. Armstrong to determine what to charge a customer.[17] Tr. at 333–35, 348–50. That business plan did not incorporate any costs other than the cost to employ one individual. *See* Tr. at 350. Mr. Armstrong further testi-

fied that between January 1994 and June 2000, Q.E.D.'s business plan was to negotiate contracts with customers that would generate revenues in excess of the costs borne by plaintiff. Tr. 403–04. Mr. Armstrong stated that the company's business plan was never revised to address the exorbitant financing costs under the Triad contract. Tr. 403–11.

The trial testimony of Mr. Armstrong makes clear that Q.E.D. relied on the line of credit provided by its factoring agreement with Triad to maintain the cash resources it needed to operate its business due to Q.E.D.'s underlying accounts receivable problem. Tr. at 404. Yet Q.E.D. failed to include in its business plan, either as a reduction of revenue or as a cost, the extremely high financing costs it incurred under its agreement with Triad. *See* Tr. at 400–404; Pl.'s Post–Trial Br. at 8. Plaintiff does not dispute that the cost of the factoring agreement adversely affected Q.E.D.'s ability to maintain its cash flow and that its cash shortage prevented the company from timely paying its employment taxes. *See* Tr. at 400–404; Pl.'s Post–Trial Br. at 8, 12; Pl.'s Ex. 5. It is the view of the court that the taxpayer's failure to address in its business planning either the cost of its factoring agreement or the accounts receivable issues underlying Q.E.D.'s cash flow problem is inconsistent with a practice of ordinary business care and prudence.

3. Q.E.D.'s Failure to Deposit and Pay Its Employment Taxes When Due

■ In seeking to abate the penalties assessed by the IRS, the taxpayer argues that it incurred the penalties, not as a result of any willful neglect, but rather as a result of Q.E.D.'s reliance on the "bad" professional advice of its accountant. Tr. at 226–28. *See* Pl.'s Post–Trial Br. at 7–8, 12. Plaintiff asserts that the retention of a certified public accountant "to advise and assist [Q.E.D.] in accounting and tax matters" evidences an exercise of ordinary business care and prudence, Pl.'s Post–Trial Br. at 7, because Q.E.D.'s president, Mr. Armstrong, "had no

---

17. At trial Mr. Armstrong drew a representation of the business plan as a graph on which the x-axis represented time, and the y-axis represented

positive and negative cash. Tr. at 344–50; Def.'s Ex. 56.

training or experience in accounting or [employment] taxes." *Id.* Rather, Mr. Armstrong had received his university degree in automotive engineering and design. Tr. at 215.

At trial, Mr. Armstrong testified that he initially retained the services of Ms. Terry Ellison, an independent certified public accountant, for advice concerning plaintiff's incorporation. Tr. at 226, 362–64. From 1994 until 1999, Ms. Ellison worked for Q.E.D. preparing plaintiff's annual reports, financial statements, and tax returns. Tr. at 227, 364. Mr. Armstrong testified that he performed the company's bookkeeping duties, and that he did not expect Ms. Ellison to perform those tasks. Tr. at 368. He created databases of cash receipts and cash disbursements to track the money coming into Q.E.D. and the money spent. Tr. at 177–78, 197–200. He conceded that while he "assimilat[ed] data, ... [he didn't] know what to do with it." Tr. at 369. Mr. Armstrong stated that the accounting services provided to Q.E.D. by Ms. Ellison were "everything that we were required to do." Tr. at 378. But he acknowledged, "I do not know what she did. I felt like I was buying a service; she was giving me what I needed." *Id.* Mr. Armstrong further testified that his wife maintained the databases he had created, *see* Tr. at 197, and that the databases were the source documents from which Q.E.D.'s financial statements and tax returns were prepared.[18] Pl.'s Post–Trial Br. at 7. Mr. Armstrong complained during his testimony that Ms. Ellison "was ... very slow at finalizing our annual reports and financial statements which ... restrict[ed] [Q.E.D.] in getting a line of credit from the bank." *Id.* at 227.

At trial, Ms. Ellison testified that she received on an annual basis Q.E.D.'s "books and records" from which her accounting firm prepared the taxpayer's tax returns.[19] Tr. at 526–28. She testified that she received the taxpayer's data "[p]ast the due date of the first tax return, which would have been March 31st of the following year, because the tax returns were always on extension." Tr. at 527. Ms. Ellison further testified, "We never got the information in order to file that first tax return. The second extension was a September 15th deadline in the following year. We would get the information somewhere before that time. I don't have an exact date but it was not early in the year." Tr. at 527. She stated that for "[all] the years that [her] firm prepared the tax returns [for Q.E.D.],"[20] she did not receive Q.E.D.'s basic data from which to prepare the taxpayer's tax returns until sometime between March 31 and September 30 of the following year. Tr. at 527–28. She testified that her firm "performed all services [for Q.E.D. that it was] asked to do." Tr. at 528.

Mr. Armstrong, in fact, admitted during his testimony that he was at least sometimes late getting Q.E.D.'s tax information to Ms. Ellison. Tr. at 628. He testified that he "sometimes sent [the annual returns] to her after they should be filed and she would get an extension." *Id.* Q.E.D. presented no evidence to contradict Ms. Ellison's testimony of consistent untimeliness.

From 1994 until October 1995, Q.E.D. retained a tax paying service from Paychex, a payroll processing service for small businesses, to deposit and pay its employment taxes. Tr. at 563–66; Def.'s Ex. 23 at 10183, 10185. Thereafter, Mr. Armstrong's wife de-

---

18. Mr. Armstrong testified that his wife had some prior experience working with ADT, a payroll processing company. *See* Tr. at 362, 560. Mrs. Armstrong had no formal training in accounting for payroll, employment taxes, business administration or finance. Def.'s Ex. 15 at 6–8. Prior to the formation of Q.E.D., she had worked as an administrative assistant. *Id.* Mrs. Armstrong did not testify at trial.

19. Ms. Ellison stated that:
From Mr. Armstrong's records, which were presented to us, which would be a cash receipts journal and a check register or a check,

a transaction accounting. Those books and records that were presented to us would be placed into our system, which we would post and we would have assets, liabilities, income and expenses. The only way to do that is to have a double-entry system.
Tr. at 526–27.

20. Ms. Ellison stated that she prepared tax returns for Q.E.D. from 1995 through 1998, but noted that she did not prepare Q.E.D.'s 1999 tax returns after Q.E.D. left her accounting firm. *See* Tr. at 528.

posited and paid Q.E.D.'s employment taxes. Tr. at 227–28, 231.

Mr. Armstrong testified at trial that, to its detriment, Q.E.D. relied on Ms. Ellison's professional expertise and advice in handling its employment taxes. *See* Tr. at 227–28. On direct examination, Mr. Armstrong summarized Ms. Ellison's advice on employment taxes as follows:

> And then we had the tax issues which was the biggest concern of mine, and then obviously like myself inexperienced in American employment taxes, whatever you want to call it, but she did actually have more experience than me in doing payroll and filing the forms for the company, so she actually had at least more experience than I did when these issues were occurring. So I was very adamant that when we stopped [the tax paying service of Paychex] that I instructed Terry Ellison she should assist my wife in making sure that we did things correctly knowing that we had lost the assistance, and we were now on our own, and we had to do our own things, and I was very insistent that they work together to make sure that we didn't make any mistakes. I was very conscious of not making mistakes. I felt that, looking back at 1999, I felt that probably we hadn't been doing it good enough, that I was being told everything was fine, things were working well. I was disappointed when I knew all the problems in 1999 I realized that they had been caused by other people giving bad advi[c]e, and in particular, Terry Ellison. We also asked her to represent the company and I gave her power of attorney to see if she could negotiate with the IRS to get some relief from the penalties which were certainly killing us.

Tr. at 227–28. In summary, then, Mr. Armstrong gave advice to his wife and Ms. Ellison to "[do] things correctly" in 1995 and concluded in 1999 that the advice had not been followed. A few minutes later, Mr. Armstrong's counsel asked him specifically about the tax penalties:

> Q: So these penalties, what was your understanding they were for?

> A: I did not know. Before the assessments came, my wife showed me something, and I said will you please ask Terry what this is for.

> Q: And did you find out what they were for?

> A: They said we didn't deposit—and because of that I asked if was correct, I told my wife, and the answer I got back was the amounts are correct.

> Q: Now these amounts of penalties, are we talking hundreds of dollars, thousand of dollars, tens of thousands of dollars?

> A: I can't remember. I mean, I have seen 26,000, 30,000 occasionally.

> Q: So these are specific penalties that were assessed and paid by the company?

> A: Yeah, I think they were like quarterly—

> Q: Yes.

> A: —assessments, and we paid them, quite a number of them.

> Q: Did that concern you when the company was getting penalized those amounts?

> A: Yes.

> Q: And you asked Terry Ellison to take care of that for the company?

> A: Yes, I wanted to try and get some relief because we were growing and it was a cash flow issue. We just didn't have the money.

> Q: What, if anything, did you think about whether the company could pay its—make partial payments of its Form 941 tax obligations? Did you have any idea about that?

> A: Not until recently. I think it was Joyce Howe who told me that we could make partial payments.

> Q: Terry Ellison never told you that.

> A: No.

> Q: What about paying 941 taxes—what about paying 941 taxes—excuse me. Strike that, please. What about filing the Form 941 tax returns, did you think anything about whether the

company could file the 941 tax returns even if it couldn't pay the taxes?

A: I had no—I didn't know anything about that. That was my wife's—

Q: Okay. So are you—were you unaware that the company could file its Form 941 tax returns even though it didn't have the money to pay the taxes?

A: I was not aware.

Q: Okay. Did you find out about that later?

A: Yes.

Tr. at 230–31.

In 1998, the IRS imposed a levy on Q.E.D.'s bank account. Pl.'s Ex. 3 (p. 2 of "Q.E.D.1998 Total Cash Out goings"(sic)); Tr. at 244. To obtain a release of that levy, Ms. Ellison negotiated for Q.E.D. a payment plan with the IRS, the terms of which required Triad to pay $50,000/month to the IRS.[21] Tr. at 244–45. Mr. Armstrong testified that he believed such payments would resolve his tax arrearage problems for the fourth quarter of 1997 and the first quarter of 1998. Tr. at 246. In 1999, Mr. Armstrong learned that the Triad payments had not resolved the tax arrearage problem. Tr. at 247. Rather, Q.E.D. "actually owed more than ... we owed at the beginning of setting up the payment plan." Tr. at 248. Q.E.D. terminated Ms. Ellison's accounting services in 1999. Tr. at 250.

Mr. Armstrong's testimony demonstrates, in the court's view, that Q.E.D. took few management steps to understand and resolve Q.E.D.'s employment tax obligations from 1995 to 1999 and that the few steps taken

were woefully inadequate. The court finds the essentially "hands off" approach of Q.E.D.'s chief executive officer to be inconsistent with the exercise of ordinary business care and prudence by a taxpayer.

In early 2000, Q.E.D. hired its current independent certified public accountant, Ms. Joyce Howe. Tr. at 250; Pl.'s Post–Trial Br. at 12. Mr. Armstrong testified that Ms. Howe promptly prepared financial statements and tax returns for Q.E.D. for 1999 which enabled the taxpayer to secure a line of credit on commercially reasonable terms from NBD Bank, now known as Bank One.[22] See Tr. at 251; Pl.'s Post–Trial Br. at 12. Mr. Armstrong testified that Ms. Howe was also instrumental in the hiring of Ms. Alice Goldade as Q.E.D.'s financial controller.[23] Tr. at 250–51; Pl.'s Post–Trial Br. at 12. Mr. Armstrong and Ms. Goldade both testified that, under Ms. Howe's supervision, Ms. Goldade installed a general ledger accounting system at Q.E.D. and began reconciling the company's bank statements on monthly basis.[24] Pl.'s Post–Trial Br. at 12. Mr. Armstrong stated that since Q.E.D. hired Ms. Goldade and obtained the Bank One line of credit, Q.E.D. has timely deposited all of its Form 941 taxes. Id.; Tr. at 251; see also Tr. at 85 (testimony of Ms. Goldade), 1523–24 (testimony of Ms. Howe).

Ms. Howe testified as an expert witness that she performed certain recomputations to determine what portions of Q.E.D.'s $50,000 payments to the IRS were allocated, respectively, to penalties and interest and to the outstanding tax liability.[25] Tr. at 1641–42.

---

21. At trial, Ms. Ellison explained that she worked with IRS agent, Clarence Glenn, to abate certain improperly assessed penalties and to release the levy imposed on Q.E.D.'s bank account. Tr. at 531, 534. Ms. Ellison testified that the IRS improperly assessed certain penalties because the agency was erroneously treating Q.E.D. as a weekly rather than a monthly depositor. Id. at 531. She stated, "They [Q.E.D.] were monthly depositors. So we did get some of that taken care of." Id. She further testified that she got the levy released "in exchange for a payment plan to be made." Id.

22. Upon obtaining that line of credit, Q.E.D. "dropped [Triad]." Tr. at 251.

23. Ms. Goldade was hired after Q.E.D.'s first controller, Diane Davis, gave notice of her inten-

tion to resign. See Tr. at 374–75. Ms. Davis worked with Q.E.D. from 1999 until 2000. Id. at 251, 374–75. Ms. Goldade began working for Q.E.D. within two weeks of Ms. Davis' resignation. Id. at 299.

24. Prior to Ms. Goldade's hiring, Q.E.D. operated without a general ledger system. See Tr. at 47–48, 534–35; Pl.'s Post–Trial Br. at 8. According to Ms. Goldade, a general ledger is "a fundamental, double-entry accounting document" providing particular detail about a business entity's assets and liabilities. Tr. at 48.

25. In preparing her expert witness report, Ms. Howe relied on IRS transcripts and published interest rates to recompute the allocations made by the IRS of several Q.E.D. payments. Tr. at 1641–42.

Her recomputations indicated that, consistent with the administrative practice of the IRS which allows undesignated payments by taxpayers to be allocated in a manner that serves the government's best interests,[26] the IRS allocated Q.E.D.'s payments first to penalties and interest and then to tax. Tr. at 1642, 1644, 1646; Pl.'s Post–Trial Br. at 11. However, Ms. Howe testified that, with respect to two of Q.E.D.'s Form 941 tax deposits, the IRS did not apply the deposits to the outstanding tax liabilities to the third quarter of 1997, the tax period to which they belonged, but rather applied them to the second quarter of 1998, against tax that had not even then accrued.[27] Jt. Ex. 19 at 175, 177, 179, 181; Tr. at 1556–58, 1601–08, 1617–19. Q.E.D. argues that such application of its payments did not comport with the rules of the IRS which require undesignated payments to be applied against the oldest outstanding liabilities first.[28] Pl.'s Post–Trial Br. at 11. At trial, Ms. Howe observed that correction of the referenced misapplied payments would effect "a minor difference in the interest that was calculated in this particular case." Tr. at 1608. She added that "significant differences ... can be made by directing the payment," Tr. at 1608, but admitted that she had no documentary evidence that plaintiff had provided specific instructions to the IRS about the application of its employment tax payments. Tr. at 1609–10. Defendant offered no evidence or argument addressing Ms. Howe's interpretation of the IRS rules addressing the application of undesignated payments to outstanding tax liabilities.[29] Ms. Howe's interpretation, which

appears to the court to be correct, appears also to be conceded by defendant.

The evidence adduced at trial indicates that Q.E.D. did not pay timely its employment taxes based primarily on the taxpayer's cash shortage. In his testimony, Mr. Armstrong acknowledged that Q.E.D. canceled its tax paying service with Paychex to gain more time to receive additional invoice payments before paying its taxes. See Tr. at 224–26; 566–67. Mr. Armstrong also testified that the combination of the lag in the payment of invoices by Q.E.D.'s customers and the increase in Q.E.D.'s payroll-related expenses created a difficult cash flow situation for the taxpayer. See Tr. at 235–36. Additionally, according to the testimony of Mr. Armstrong, Ms. Goldade, Q.E.D.'s current financial controller, and Ms. Howe, plaintiff's expert and outside accountant, an examination of Q.E.D.'s bank account balances indicates that on 22 of the 36 pay dates in controversy, the taxpayer did not have sufficient cash to pay all of its employment taxes when due. Pl.'s Post–Trial Br. at 12; Pl.'s Ex. 5; Tr. at 83, 253, 1560, 1579.

Mr. Armstrong testified that he did not know that partial tax payments could be made at the time Q.E.D. was not paying timely its employment taxes, see Tr. at 231, but Q.E.D. offered no evidence that such knowledge would have improved the timeliness of Q.E.D.'s employment tax payments. Moreover, as plaintiff's expert Ms. Howe stated during her testimony, Q.E.D. has presented no evidence that the IRS applied its payments differently from the taxpayer's specific instructions. See Tr. at 1610. Although partial payments and directed pay-

---

**26.** This practice is set forth in Rev. Rul. 79–284, 197–2 C.B. 83, 1979 WL 51035, which superceded the portion of Rev. Rul. 73–305, 1973–2 C.B. 43, 1973 WL 32999 on this issue. See Pl.'s Post–Trial Br. at 11. The 1973 Revenue Ruling is the authority on which defendant's expert, Lynn Bell, relied for the proposition that undesignated payments are allocated to tax, penalty, and interest, in that order. Id.

**27.** Ms. Howe specifically referenced: (1) Q.E.D.'s Form 941 tax deposit of $88,097 made on April 17, 1998 and (2) its Form 941 tax deposit of $89,835 made on May 18, 1998. Jt. Ex 8 at 2; Jt. Ex. 19 at 181; Tr. at 1601–03. Based upon her review of the tax transcripts, Ms.

Howe stated that the two deposits were the taxpayer's Form 941 tax deposits due, respectively, on July 18, 1997 and August 15, 1997. Jt. Ex. 8 at 2; Tr. at 1601–03.

**28.** The governing rules are Rev. Rul. 73–305, 1973–2 C.B. 43, 1973 WL 32999; Rev. Rul. 79–284, 1979–2 C.B. 83, 1979 WL 51035. Pl.'s Post–Trial Br. at 11.

**29.** At trial, the court directed the parties to include in their post-trial briefing specific references to the provisions of the IRS procedural manual that defendant may have been violated when applying Q.E.D.'s tax payments to its outstanding ta liabilities. Tr. at 1619.

ments might have mitigated the penalties assessed against Q.E.D., the testimony of the witnesses at trial points to the serious cash shortage as the primary cause of Q.E.D.'s inability to pay timely the employment taxes it owed. While Mr. Armstrong pointed to bad professional advice to excuse Q.E.D.'s non-payment, the court finds that Q.E.D.'s failure to pay its employment taxes timely cannot be excused by such advice in this case. Mr. Armstrong, as Q.E.D.'s chief executive officer, simply did not expend management attention to the payment of the taxes that was in any way proportionate to the importance of the taxpayer's responsibility. *See* Tr. at 226–28. Q.E.D.'s cash flow situation directly impacted the taxpayer's ability to pay its employment taxes when due, and Mr. Armstrong acknowledged during his testimony that, between 1995 (after the cancellation of the Paychex tax paying services) and 1999 (the date of hiring of Q.E.D.'s first controller, Diane Davis), he knew that Q.E.D. could not pay its taxes on time because the taxpayer did not have the money. Tr. at 574.

In order further to determine whether Q.E.D.'s failure to pay timely its employment taxes occurred notwithstanding the absence of carelessness and the exercise of ordinary business care and prudence, *see Boyle*, 469 U.S. at 246 n. 4, 105 S.Ct. 687, the court now considers the evidence adduced at trial concerning how the taxpayer managed its cash flow problem in its business decisions regarding expenditures.

### 4. Q.E.D.'s Business Expenditures

Plaintiff filed federal income tax returns for calendar years 1994 through 2000, in which it reported the following amounts as taxable income: (1) -$ 29,615 in 1994, Jt. Ex. 1 at 1; (2) -$ 44,811 in 1995, Jt. Ex. 2 at 1; (3) -$ 88,623 in 1996, Jt. Ex. 3 at 1; (4) -$ 49,982 in 1997, Jt. Ex. 4 at 1; (5) -$ 45,041 in 1998, Jt. Ex. 5 at 1; (6) $ 112,537 in 1999, Jt. Ex. 6 at 1; (7) $ 59,458 in 2000, Jt. Ex. 7 at 1.[30] From 1997 until 2000, Q.E.D. failed to pay its employment taxes timely and thereby

incurred tax penalties for eleven of the sixteen quarters. *See* Pl.'s Post–Trial Br. at 1. Mr. Armstrong conceded during his trial testimony that he "knew it was important to pay [Q.E.D.'s employment taxes] on time." Tr. at 569. He further testified that, knowing that Q.E.D. would incur "some [tax] penalties," he made certain business decisions to expend money for purposes other than paying the owed employment taxes. Tr. at 572, 574.

#### a. Expenses Viewed as Standard Industry Practices

Mr. Armstrong testified that he authorized pay for employees even though he knew that Q.E.D. did not have enough money to deposit or pay employment taxes when due. Tr. 572, 574. Moreover, in preference to paying the employment taxes when due and with Mr. Armstrong's approval, plaintiff paid $ 146,377.24 for sports tickets, entertainment, parties, and maintenance, insurance, and lease payments on cars for key personnel from July 1997 through June 2000.[31] Def.'s Post–Trial Br. at 8. With respect to the sports tickets, Allen S. Phillips, Q.E.D.'s Vice President of Sales, testified at trial that Mr. Armstrong refused to purchase hockey tickets or luxury suites for use by the company's salesmen but that he did authorize the purchase of a block of basketball tickets. Tr. at 161–63. Mr. Phillips further testified that under the heading of entertainment, Q.E.D. provided client "give-aways" such as sporting event tickets, golf outings, fishing trips, golf shirts, pens and mouse pads to generate business. Tr. at 159–61. Mr. Armstrong testified that included in Q.E.D.'s business expenses were the vehicle lease payments, insurance and maintenance costs for himself and the company's vice-presidents. Tr. at 271. Mr. Phillips testified that the provision of company cars to the sales personnel, or a cash equivalent thereto, was a standard industry practice. Tr. at 164. Defendant did not dispute that such expenditures were standard industry practices but challenged Q.E.D.'s decision

---

**30.** Plaintiff's tax returns for the years 1994 through 1998 indicate negative taxable income. *See* Jt. Ex. 1–5.

**31.** The annual amounts spent for these expenses were: (1) $ 23,914.75 in 1997; (2) $ 51,740.42 in 1998; (3) $ 52,773.71 in 1999; and (4) $ 17,948.36 in 2000. Def.'s Post–Trial Br. at 8–10.

to incur such expenses rather than to pay its employment taxes when due. *See* Def.'s Post–Trial Br. at 8.

Examining Q.E.D.'s business expenditures under the legal standard set forth in *Boyle*, 469 U.S. at 245–47, 105 S.Ct. 687, the court is not persuaded that Q.E.D.'s business decisions to incur certain entertainment and business-related expenses intended to develop and maintain contracts with customers and deemed standard in the industry were reflective of a reckless indifference to the taxpayer's employment tax obligations or were inconsistent with ordinary business care and prudence as the taxpayer attempted to maintain its customer base while managing its cash flow problem. Although the court has some concern that the payments for vehicle leases, maintenance, and insurance could have amounted to imprudent compensation to executives and may not reflect the exercise of ordinary business care and prudence in these circumstances, the evidence is not sufficiently clear on the point to conclude that these expenditures were in and of themselves imprudent.

### b. Mr. Armstrong's Compensation

■ Among the other expenditures that defendant challenged were: (1) Q.E.D.'s cash payments toward the costs of a European education for the son of Q.E.D.'s president without a correlative commitment from the son to work for Q.E.D. upon graduation,[32] *see* Tr. at 301–03; (2) Q.E.D.'s payment of Mr. Armstrong's life insurance premiums on a policy that designated his wife rather than Q.E.D. as the beneficiary, *see* Tr. at 624–26, 634; and (3) Q.E.D.'s payment of salaries for Mr. and Mrs. Armstrong that included incremental increases.[33] *See* Def.'s Post–Trial Br. at 7–8, 13. Defendant argued that the education payments and the life insurance premium payments effectively increased the compensation of Q.E.D.'s president at the same time that the taxpayer was not paying timely its employment taxes. *See id.*

Mr. Armstrong addressed defendant's claims that he had received "additional, unauthorized compensation," *see* Def.'s Post–Trial Br. at 7–8, 13, in his trial testimony. With respect to Q.E.D.'s payments toward his son's education, Mr. Armstrong testified that the arrangement is "what we refer to in England as a sponsorship situation, whereby a company will sponsor you to go to college, to cover your costs and fees, so that you get a degree. And then you can join that company later to add value to that company." Tr. at 302. Mr. Armstrong further testified that his son works for Q.E.D. during the summer months, without pay, as he gains work experience. *Id.*

With respect to the salary increases he received from Q.E.D., Mr. Armstrong testified that the decision to increase his salary from $70,000 in 1996 to $130,000 in 1997, *see* Tr. at 620, was made before "the tax problems occurred" and was premised on "the fact that in 1994 and 1995, [he] basically was paid almost nothing." Tr. at 617–18. Mr. Armstrong further testified that although Q.E.D. did nothing to reduce his salary in 1997 after learning that Q.E.D.'s employment taxes were not being paid timely, Tr. at 619, Q.E.D. did reduce his salary by $35,000 in 1998. Tr. at 620. Regarding his salary of $160,000 in 1999, Mr. Armstrong explained that Q.E.D. "had gone through a repayment plan and the business had gone to a $10 million turnover, so I thought we were in a position to catch everything up." Tr. at 623. Similarly, regarding his salary of $198,675 in 2000, Mr. Armstrong explained that "there was no change in my compensation." *Id.* at 624. What appeared to be a compensation increase of $38,675 was actually a one-time correction of a prior accounting problem.[34]

---

**32.** Mr. Armstrong's son is studying mechanical engineering at Nottingham University. Tr. at 303.

**33.** Q.E.D. paid its president and his wife, respectively, the following amounts:

| | Thomas David Armstrong | Helen Armstrong |
| --- | --- | --- |
| 1996 | $ 70,000 | $ 0 |
| 1997 | $130,000 | $44,000 |
| 1998 | $ 95,000 | $38,000 |
| 1999 | $160,000 | $26,000 |
| 2000 | $198,675 | $32,000 |

Def.'s Post–Trial Br. at 13; Def.'s Ex. 2–6.

**34.** The adjustment was made for tax purposes to correct the problem created when Q.E.D. made payments on Mr. Armstrong's life insurance poli-

*Id.* at 624–25. Mr. Armstrong added that "in the year 2000, … I felt that we were in a very good, strong position to move forward and we have never been late in paying our taxes ever since." Tr. at 625.

The court finds, however, that Q.E.D.'s failure to adjust Mr. Armstrong's compensation in the face of mounting tax penalties for untimely payment of the taxpayer's employment taxes was not an exercise of ordinary business care and prudence in the management of Q.E.D.'s apparent cash flow shortage even if Mr. Armstrong believed that Q.E.D.'s cash situation was improving. The compensation afforded as a subsidy to Mr. Armstrong's son's education also appears to the court outside the scope of an exercise of ordinary business care and prudence in these circumstances.

c. Paying Invoices Submitted by Q.E.D.'s Majority Shareholder

■ Mr. Armstrong and Ms. Howe both testified that timely payment of all of Q.E.D.'s employment taxes on most of the pay dates in issue would have required the taxpayer to incur "undue hardship" in that Q.E.D. would have been required to forego paying its employees, specifically the automotive engineers contracted out to Q.E.D.'s customers. *See* Pl.'s Post–Trial Br. at 7, 12; Tr. at 253, 1586. However, the bulk of Q.E.D.'s payments to employees were made through affiliates of Q.E.D.

Between 1997 and 2000, Q.E.D. provided engineers on a temporary basis to its customers. Def.'s Post–Trial Br. at 11. A number of these engineers were provided to Q.E.D. by Hammond Machinery, Q.E.D.'s majority shareholder. Pl.'s Ex. 6 at 1, 6–7. Other engineers were provided to Q.E.D. by RGH Associates. Pl.'s Ex. 6. RGH Associates is "an unincorporated business owned and operated by Royston G. Hammond" out of his home. Pl.'s Ex. 6 at 1; Hammond Dep. at 43. In his deposition, Mr. Hammond de-

scribed RGH Associates as "a loose association of friends." Hammond Dep. 35–36. Mr. Hammond testified that, of the friends in RGH Associates, he was the only one involved in supplying engineers to companies internationally. *Id.* at 40–41. He further testified that as a benefit of supplying engineers to companies, he was able to learn when those companies required machinery for which Hammond Machinery would offer quotes without revealing that the engineers supplied under the RGH Associates label were also working on behalf of Hammond Machinery. *Id.* at 40–43. Mr. Hammond stated that RGH Associates invoiced Q.E.D. the same amounts that RGH Associates paid the engineers supplied to Q.E.D. *See id.* at 42. The record is without any evidence that either corroborates or contradicts this statement. Nonetheless, whether or not Mr. Hammond directly profited from furnishing engineers to Q.E.D. (or profited indirectly through Hammond Machinery), the record does show that Q.E.D. paid $ 3,302,535 to Mr. Hammond, Q.E.D.'s majority stockholder's controlling stockholder, during the period of time that Q.E.D. was not paying its employment taxes when due. Def.'s Post–Trial Br. at 11.

The record also shows that between 1997 and 2000, Q.E.D. (Europe), Ltd., a company organized under the laws of the United Kingdom,[35] supplied engineers to Q.E.D. for whose engineering services Q.E.D. (Europe), Ltd. invoiced and was paid by Q.E.D. a sum approximating $464,455. Pl.'s Ex. 7. The record indicates that Mr. Armstrong owned the largest block of shares of Q.E.D. (Europe), Ltd. (3000 shares) and that Mr. Hammond owned 2500 shares of Q.E.D. (Europe), Ltd.[36] Jt. Ex. 22 at 41–42. Whether or not Q.E.D. (Europe) Ltd. profited from furnishing engineers to Q.E.D., the record establishes that Q.E.D. paid nearly a half million dollars to a foreign company in which its president had an ownership interest in pref-

---

cy that were to have been borne by Mr. Armstrong. Tr. at 626, 634.

35. The company formerly named MLT Consultants Limited was renamed Q.E.D. Europe, Ltd. in March 1996. Jt. Ex. 22 at 37–38.

36. This share ownership was reflected in a September 14, 1996 filing by Q.E.D. (Europe), Ltd. of a Companies Form No. 88(2) "Return of Allotments of Shares" pursuant to the Companies Act of 1985. Jt. Ex. 22 at 41–42.

erence to paying timely the taxpayer's employment taxes. *See* Pl.'s Ex. 7.

While Q.E.D. paid invoices for engineering services supplied by Hammond Machinery, RGH Associates, and Q.E.D. (Europe), Ltd., Q.E.D. did not inform its majority shareholder, Hammond Machinery, of its tax problems prior to August 2002. Def. Post–Trial Br. at 7; Hammond Dep. at 90–91. Defendant argues that plaintiff's failure to notify "its majority stockholder as to [tax] problems that could put the shareholder's investment at risk," and plaintiff's failure to offer its "majority shareholder an opportunity to contribute advice or cash to resolve the problem" is evidence that Q.E.D. did not exercise ordinary business care and prudence in the handling of its tax matters but rather acted "careless[ly]". Def. Post–Trial Br. at 7. The court agrees. The court is further persuaded that Q.E.D. failed to exercise ordinary business care and prudence in the handling of its tax matters by evidence that Mr. Armstrong and his wife accepted $80,000 from Mr. Hammond as a down payment on the 1997 purchase of a $298,000 home in Florida that was used intermittently by Q.E.D. sales personnel for business development purposes and for personal use. *See* Tr. at 164–66, 303, 307–12.

Mr. Armstrong's testimony makes clear that Q.E.D.'s failure to pay its employment taxes when due was an intentional failure born of a conscious business decision on the part of the taxpayer. Q.E.D.'s president acknowledged that Q.E.D.'s tax situation "is always in my head .... It has been there since we've had problems. It's one I want to

fix; it's one I want to address. But you have to then make a decision what you do and it's a business decision. It's quite difficult." Tr. at 615. He also acknowledged that when making such decisions, he "always considered ... [s]hould I not spend the money and pay towards the taxes." *Id.* at 616.

The evidence shows that Q.E.D. paid almost $4 million in invoices submitted by companies that are owned in significant part by Q.E.D.'s majority shareholder and Q.E.D.'s president himself during the same period of time when Q.E.D. was not paying its employment taxes timely, and this all without Q.E.D.'s even raising the issue with the principal of its majority stockholder. The court finds that Q.E.D.'s intentional failure to pay its employment taxes when due does not comport with the exercise of ordinary business care and prudence and is not excused by a claim of undue hardship. Based on the credible evidence introduced at trial,[37] Q.E.D. may not avoid responsibility for the assessed tax penalties.

### D. Defendant's Counterclaims

The IRS has counterclaimed for judgment against Q.E.D. for: (1) unpaid employment taxes and penalties imposed under I.R.C. §§ 6651 and 6656 for the first quarter of 1998; and (2) penalties imposed under I.R.C. §§ 6651 and 6656 for the third quarter of 1999, the first quarter of 2000, and the second quarter of 2000. Sec. Am. Ans. ¶¶ 22–29; Def.'s Post–Trial Br. at 2. Plaintiff does not dispute the accuracy of the Certified Record of Assessments and Payments for the tax periods in question.[38] *See* Pl.'s Post–

---

37. The trial presented few credibility issues. Mr. Armstrong, the principal witness, was articulate and forthright. A few conflicts, notably the one between Ms. Ellison's view of her discharge of her responsibilities ("[Our firm] performed all services we were asked to do"), Tr. at 528, and Mr. Armstrong's view ("bad advi[c]e"), Tr. at 228, are easily attributable to differing memories and interests and do not involve matters dispositive of the case. Even if Ms. Ellison's advice were "bad," an exercise of ordinary business care and prudence would have addressed Q.E.D.'s tax and related business problems more robustly.

38. Plaintiff does dispute, however, the amount of defendant's counterclaim for the quarter ended

March 31, 1998. With respect to that tax period, the IRS seeks $360,730. Sec. Am. Ans. ¶ 24. Q.E.D. argues that the Certified Record of Assessments and Payments reflects a liability of $173,557. *See* Jt. Ex. 19 at 167, 170. At trial, plaintiff withdrew its argument that the IRS misapplied the taxpayer's payments for the first quarter of 1998. *See* Tr. at 97–99. Plaintiff does not contest liability but urges that the Certified Record of Assessments and Payments requires further review. Pl.'s Post–Trial Br. at 2; Jt. Ex. 19 at 167, 170. Based on evidence at trial indicating that defendant may have erred in the application of certain tax payments by Q.E.D., specifically, by applying Q.E.D.'s payments to taxes that had not yet accrued rather than in accordance with defendant's internal proce-

Trial Br. at 2–3; Jt. Ex. 19. Rather, plaintiff contends that it is entitled to an abatement of the penalties on the same grounds that plaintiff seeks an abatement of the penalties paid for the tax periods set forth in Q.E.D.'s First Amended Complaint. *See* Pl.'s Post–Trial Br. at 1–3. For the reasons discussed above, the court finds that plaintiff is not entitled to an abatement of the penalties paid for the tax periods identified in its amended complaint and that defendant is entitled to the amounts set forth in the taxpayer's Certified Record of Assessments and Payments for the tax periods in question, as corrected to rectify the misapplication of Q.E.D.'s Form 941 tax deposits of $ 88,097 made on April 17, 1998 and $ 89,835 made on May 18, 1998.

## III. Conclusion

Having considered the evidence introduced at trial and for the foregoing reasons, the court finds that plaintiff is not entitled to relief and defendant is entitled to payment on its counterclaims. On or before January 31, 2003, defendant shall submit to plaintiff for review a Certified Record of Assessments and Payments for Q.E.D. revised in accordance with this opinion (revised Certified Record), and on or before February 28, 2003, the parties shall jointly file a revised Certified Record with the court or, absent agreement, shall contact the court to schedule any proceedings necessary to finalize the revised Certified Record.

IT IS SO ORDERED.

dures, defendant shall review the Certified Record of Assessments and Payments for errors and correct any mistakes.